UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HAIYAN CHEN, KENYA WATSON, S.O., GERTRUDE CRIBBS, HANA BROOME, and MEI IENG LEE, individually, and on behalf of all similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>TOM VILSACK, in his official capacity as Secretary of the U.S. Department of Agriculture (USDA), and CINDY LONG, in her official capacity as Administrator of the USDA Food and Nutrition Service,<br><br>Defendants. | Civ.<br><br>**COMPLAINT** |

Plaintiffs Haiyan Chen, Kenya Watson, Gertrude Cribbs, Hana Broome, S.O., and Mei Ieng Lee, for their Complaint against Defendants Tom Vilsack and Cindy Long in their respective official capacities at the United States Department of Agriculture (USDA) and the USDA Food and Nutrition Service (FNS), allege as follows:

## PRELIMINARY STATEMENT

1.      Plaintiffs are the victims of an electronic form of theft known as "skimming," and represent only a few of the more than 10,000 documented instances of such theft in New York State since January 2022. Plaintiffs are each from low-income households participating in the Supplemental Nutrition Assistance Program (SNAP) program. Through skimming, perpetrators siphoned hundreds—or, in some cases, thousands—of dollars from each of the Plaintiffs' SNAP accounts, leaving Plaintiffs with no way to feed their families.

2.      Skimming occurs when perpetrators install a Bluetooth-enabled, card-reading device at a point-of-sale (POS) device in a retail store to capture a consumer's credit or debit card number, account information, and personal identification number (PIN). Perpetrators can then use this information to create a counterfeit "dummy" card and steal from the unsuspecting victim's account. In recent years, the financial industry's switch to chip and "tap-to-pay" cards, which are significantly more difficult to skim, has reduced incidences of skimming.

3.      SNAP participants are susceptible to skimming because they use an Electronic Benefits Transfer (EBT) card issued by State agencies to purchase SNAP-authorized food products by swiping their cards through POS devices at grocery stores and other authorized vendors using a magnetic strip. At present, these cards can only be swiped using a magnetic strip and do not utilize the chip or "tap-to-pay" technology that is now standard-issue for most debit and credit cards. This leaves EBT cards—and, by extension, SNAP benefits—particularly vulnerable to skimming. While this case focuses solely on victims in the State of New York, EBT card skimming is rising at an alarming rate across the country.

4.      Defendants do not dispute that Plaintiffs were the victims of fraud and are in no way to blame for the thefts of their SNAP benefits. Nor do Defendants contest that they could have better protected the SNAP program and its participants from skimming, such as by using chip or "tap-to-pay" cards in place of outdated swipe cards. Nevertheless, Defendants have purported to bar replacement of Plaintiffs' losses and do not authorize New York State to do so using federal funds. Defendants have based their refusal on 7 C.F.R. § 274.6, a regulation promulgated in 2010 which authorizes States to replace benefits after a SNAP participant's card has been reported stolen or if food has been lost in a household misfortune, but does not expressly allow for reimbursement when benefits have been stolen via skimming. As a result, Plaintiffs are left with no ability to feed

their families until issuance of the following month's benefits, and must desperately turn to food banks, relatives, and neighbors to make up the shortfall.

5.      However, 7 C.F.R. § 274.6 provides Defendants with no excuse for failing to replace benefits stolen through skimming. In adopting the current EBT system, Congress made clear that USDA-FNS must continue to provide program participants with replacement benefits on terms "similar" to those available to participants under the old "paper coupon" system, which permitted replacement of benefits—then distributed via paper coupons—stolen prior to receipt. Today, skimming occurs before participants "receive" their benefits because, unlike paper coupons (which EBT cards replaced), benefits are not received until the participants use their EBT cards to purchase food and other goods at authorized retailers. Further, while Defendants allow replacement for participants whose EBT cards were stolen and whose benefits were subsequently drawn from their accounts, they deny relief to victims who are still in possession of their EBT cards but whose benefits have been stolen via skimming. This distinction defies any reason. By premising replacement on the mode of theft used to steal benefits, Defendants have acted arbitrarily, capriciously, and contrary to law.

6.      Accordingly, pursuant to the Administrative Procedure Act, Plaintiffs, individually and as a class of all New York State residents who lost their SNAP benefits as a result of skimming and who have not had the full value of their stolen benefits replaced, seek a declaration that Defendants' rules and policies are unlawful, and an injunction enjoining Defendants from refusing to replace (or refusing to allow New York State to replace using federal funds) the full value of SNAP benefits stolen by skimming.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, as this case arises under the Food and Nutrition Act, 7 U.S.C. § 2011 *et seq*. and the Administrative Procedure Act (APA), 5 U.S.C. §§ 551 *et seq*.

8.      Venue is proper in this court pursuant to 28 U.S.C. § 1391 because the Southern District of New York is the where the events giving rise to the Plaintiffs' claims have occurred.

9.      Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202 and by Rule 57 of the Federal Rules of Civil Procedure. Injunctive relief is authorized by Rule 65 of the Federal Rules of Civil Procedure and by the Court's equitable authority.

## PARTIES

**Plaintiffs**

10.      Named Plaintiff Haiyan Chen lives in Brooklyn, New York.

11.      Named Plaintiff Kenya Watson lives in Brooklyn, New York.

12.      Named Plaintiff Gertrude Cribbs lives in Queens, New York.

13.      Named Plaintiff Hana Broome lives in New York, New York.

14.      Named Plaintiff Mei Ieng Lee lives in Brooklyn, New York.

15.      Named Plaintiff S.O. lives in New York City, New York.

**Defendants**

16.      Defendant Tom Vilsack is the Secretary of the USDA, the agency responsible for regulating SNAP benefits through its FNS Department. Defendant Vilsack is sued in his official capacity.

17.      Defendant Cindy Long is the Administrator of FNS, which is a sub-agency of USDA responsible for regulating SNAP benefits. Defendant Long is sued in her official capacity.

## STATUTORY AND REGULATORY CONTEXT

### The History & Overview of the SNAP Program

18.     In 1964, Congress established the federally funded, State-administered Food Stamp Program. Food Stamp Act of 1964, Pub. L. No. 88-525, 78 Stat. 703 (codified as amended at 7 U.S.C. § 2011 *et seq.*). The program aims to "safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households," and to "permit low-income households to obtain a more nutritious diet through normal channels of trade by increasing food purchasing power for all eligible households who apply for participation." 7 U.S.C. § 2011; 7 C.F.R. § 271.1 (2020).

19.     As of 2008, the Food Stamp Program has since been renamed the Supplemental Nutrition Assistance Program (SNAP), and the federal Food Stamp Act was renamed the Food and Nutrition Act of 2008 ("SNAP Act"). Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, §§ 4001–02, 122 Stat. 1651, 1853 (2008).

20.     Regulations promulgated by the USDA-FNS implement the SNAP Act and are applicable to all agencies administering SNAP programs. *See* 7 U.S.C. §§ 2013(c); 2020 (e)(6)(A).

21.     SNAP eligibility is restricted to low-income households. 7 U.S.C. § 2014(c); 7 C.F.R. § 273.9(a) (2017). In 2023, the net monthly income limit for SNAP eligibility is set at $1,133 for a single adult and $1,920 per month for a family of three. *SNAP Eligibility*, U.S. Dep't of Agric., https://www.fns.usda.gov/snap/recipient/eligibility (last visited Feb. 18, 2023).

22.     The maximum SNAP benefit is adjusted on an annual basis by USDA to account for cost of living increases. 7 C.F.R. § 273.9(a)(3) (2017). For the period from October 1, 2022, through September 30, 2023, the maximum benefit was $281 per month for one person and $740

per month for a family of three. Policy Memo, U.S. Dep't of Agric., SNAP-Fiscal Year 2023 Cost-of-Living-Adjustments (Aug. 9, 2022), https://www.fns.usda.gov/snap/fy-2023-cola.

23.     Federal law provides that SNAP participants are legally entitled to SNAP benefits provided they are eligible and apply for assistance. *See* 7 U.S.C. § 2014(a) ("Assistance under this program *shall be furnished* to all eligible households who make application for such participation.") (emphasis added).

24.     Although SNAP is a federally funded program, State agencies are responsible for administering the SNAP program within each State consistent with federal law. *See* 7 U.S.C. § 2020(a)(1); 7 C.F.R. § 271.4 (2020).

25.     In New York State, the State agency responsible for administering SNAP benefits is the Office of Temporary and Disability Assistance (OTDA).

26.     The OTDA issues SNAP program participants benefits once per month, usually on the same day every month. SNAP participants then use these benefits to purchase food throughout the month, assuring that perishable items will remain fresh and that food is not wasted. *Supplemental Nutrition Assistance Program (SNAP)*, Office of Temp. & Disability Assistance, https://otda.ny.gov/programs/snap/#:~:text=SNAP%20benefits%20are%20provided%20through, deposited%20right%20into%20your%20account (last visited Feb. 18, 2023).

27.     Federal law requires that State agencies, including New York's OTDA, "provide timely, accurate, and fair service to applicants for, and participants in, the supplemental nutrition assistance program[.]" 7 U.S.C. § 2020(e)(2)(B)(i).

28.     During the COVID-19 pandemic, Section 1101 of the Families First Coronavirus Response Act (FFCRA), as amended by The Continuing Appropriations Act, 2021 and Other Extensions Act, authorized supplemental assistance for households with children who would have

otherwise received free or reduced price school meals under the Richard B. Russell National School Lunch Act in the form of Pandemic Electronic Benefits Transfer (P-EBT) benefits. FFCRA, Pub. L. 116–127.

29.     P-EBT benefits operate within the same infrastructure as SNAP benefits and, according to Defendants, these P-EBT and SNAP benefits are indistinguishable for benefit issuance and redemption purposes.

**Pre-EBT Rules on Replacement and Liability for Stolen SNAP Benefits**

30.     When the food stamp program first began, participants received their benefits in the form of paper coupons. These paper coupons were issued to participants using several methods. Some States mailed paper coupons directly to participants. H.R. Rep. No. 97-687, at 51 (1983). Others mailed "Authorization-to-Participate" documents to participants, who could take these documents to a post office, bank, or other authorized location to receive their paper coupons. *Id*.

31.     In the late 1990s, Congress amended the SNAP Act to require State agencies to deliver SNAP benefits via an EBT system that complies with federally established standards. 7 U.S.C. § 2016(h); *see also* Pub. L. No. 104-193, § 825, 110 Stat. 2105, 2324 (1996). Under this system, participants are issued an EBT card to access their benefits instead of paper coupons.

32.     Until 2010, USDA-FNS regulation 7 C.F.R. § 274.6 (since replaced) governed the replacement of stolen SNAP benefits. Under this regulation, and in recognition of Congress' aim to protect and improve service for program participants, State agencies were authorized to replace stolen coupons sent by mail if the theft occurred prior to the participants' "receipt" of the coupons. If the coupons "were not received in the mail . . . [or] were stolen from the mail," then State agencies were authorized to replace the household's stolen benefits. 7 C.F.R. § 274.6(a)(1)(ii) (1989) (former regulation). However, if coupons were "lost, stolen or misplaced after receipt,"

then State agencies were not authorized to replace the coupons. *Id*. § 274.6(a)(2) (1989) (former regulation).

33.     In 1981, the Senate had proposed and passed the same "receipt" provision intending to combat fraud and trafficking in food stamps. *See* S. Rep. No. 97-128, at 63 (1981). The Senate intended to limit replacement benefits to coupons lost or stolen prior to receipt because, prior to the advent of the EBT system, the government had no way to track if paper coupons were being used fraudulently. *Id*. While the Senate-passed "receipt" provision was not passed into law, the USDA nevertheless adopted this provision in its regulations (subsequently codified at 7 C.F.R. § 274.6 (1989) (former regulation)) citing the same concerns identified by the Senate. *See* Replacement of Nondelivered, Stolen or Destroyed Food Stamp Authorizations and Food Coupons, 46 Fed. Reg. 50043, 50278 (Oct. 9, 1981). According to the USDA, the "[r]eplacement of coupons reported stolen after receipt is an area in which it is difficult to avoid some fraudulent reporting" because "[t]heft of coupons is difficult to verify." *Id*. At around this same time, the legislative history shows that Congress authorized the creation of the EBT system specifically to track the use of benefits and eliminate fraud and abuse in the system. *See* H.R. Rep. No. 97-106, at 258 (1981); *see also* H.R. Rep. No. 97-687, at 52 (1983).

34.     The former USDA-FNS regulation also authorized States to replace "Authorization-to-Participate" documents that were not received in the mail, stolen from the mail or after receipt, or defective, as well as coupons, authorization documents, and food purchased with coupons that were destroyed in a household misfortune. 7 C.F.R. §§ 274.6(a)(1)(i)–(iv) (1989) (former regulation). The former regulation contained other rules regarding the replacement of benefits, including the requirement that the household experiencing the loss report it to the

agency within 10 days, and limits on the number of replacement allotments in certain circumstances. 7 C.F.R. § 274.6(b) (1989) (former regulation).

35.     A separate regulation, 7 C.F.R. § 276.2 (1989) (former regulation), concerned State liability for the replacement of benefits. Under this regulation, States were strictly liable for coupon shortages and losses due to theft (among others) "except for those duplicate issuances in the correct amount that are the result of replacement issuances made in accordance with § 274.6" discussed above. 7 C.F.R. § 276.2 (1989) (former regulation).

36.     Previously, the Electronic Fund Transfer Act (EFTA), enacted in 1978 and codified at 15 U.S.C. §§ 1693, *et seq.*, protected all consumers against losses from unauthorized electronic transactions, including users of debit, credit, and EBT cards. That changed in 1996, when Congress amended the statute to remove the EBT systems that distribute needs-tested benefits, such as the SNAP EBT system, from its protections. *See* Pub. L. No. 104-193, § 907 110 Stat. 2105, 2350 (1996); 15 U.S.C. § 1693b(d). Instead, in its place, Congress amended the SNAP statute to ensure that EBT cardholders would be entitled to the same replacement of benefits rules previously enjoyed by coupon holders. *See* Pub. L. No. 104-193, § 825, 110 Stat. 2105, 2324 (1996). Codified at 7 U.S.C. § 2016(h)(7), the provision states:

> Regulations issued by the Secretary regarding the replacement of benefits and liability for replacement of benefits under an electronic benefit transfer system shall be similar to the regulations in effect for a paper-based supplemental nutrition assistance issuance system.

37.     The replacement of benefits provision in effect when Congress issued this command was 7 C.F.R. § 274.6 (1989) (former regulation), which authorized replacement of paper coupons sent by mail if the theft occurred prior to the SNAP participants' "receipt" of the coupons.

38.     The SNAP Act, as amended by the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA), Pub. L. No. 104-193, § 825, 110 Stat. 2105, 2324 (1996),

also directed the USDA and State agencies administering the SNAP program to "take into account evolving technology and comparable industry standards" regarding "privacy, ease of use and access to and service in retail food stores" following the switch from paper coupons to EBT. 7 U.S.C. § 2016(h)(2)(A), as amended by Pub. L. 101-624 § 1729, 104 Stat. 3359, 3789 (1990). Congress also commanded the agency to implement "other measures to protect against fraud and abuse." 7 U.S.C. § 2016(h)(2)(C)(i).

**USDA's Policy on Authorizing the "Replacement of Benefits"**
**and "Liability for Replacement"**

39.     Congress's intent in adopting 7 U.S.C. § 2016(h)(7) is clear: under the EBT system, as under the paper-based system, States are authorized to replace benefits stolen prior to "receipt," and the federal government is responsible for covering the cost.

40.     As legislative history shows, part of Congress' motivation in creating this EBT system was to benefit and protect participants in the program. Members of Congress and administration officials described the EBT system as being "more humane, claimed that the EBT system would allow "people to participate in purchasing their food with greater dignity," and said that it would "improve accountability and security while maintaining or improving service to recipients." Fraud in the Food Stamp Program: Hearing Before the Subcomm. on Domestic Mktg., Consumer Relations, and Nutrition of the Comm. on Agric., 97th Cong. 25 (1981); Formulation of the 1990 Farm Bill: Hearings Before the Subcomm. on Domestic Mktg., Consumer Relations, and Nutrition of the Comm. on Agric., 101st Cong. 14, 995 (1990).

41.     On April 12, 2010, the USDA promulgated a new set of regulations entitled "Supplemental Nutrition Assistance Program, Regulation Restructuring: Issuance Regulation Update and Reorganization to Reflect the End of Coupon Issuance Systems." 75 Fed. Reg. 18,377 (Apr. 12, 2010). As stated in the adopting release, the "changes to the SNAP regulations are put

forth to account for the replacement of the paper coupon issuance system with the Electronic Benefits Transfer (EBT) system as the nationwide method of distributing benefits to program recipients." *Id.*

42.     However, contrary to the clear mandate of the SNAP Act, USDA's new version of 7 C.F.R. § 274.6 was not remotely "similar" to the preceding version that governed paper coupons because it does not authorize replacement of benefits stolen or lost before the SNAP participants received these benefits. Instead, the new version of 7 C.F.R. § 274.6 limits States' ability to replace benefits where "the household reports that food purchased with [SNAP] benefits was destroyed in a household misfortune," 7 C.F.R. § 274.6(a)(1) (2013), or where the household informs the agency that their EBT card has been lost or stolen, 7 C.F.R. § 274.6(b)(2) (2013). No provision was made for replacing benefits stolen from SNAP participants before receipt through no fault of their own, even though Congress—and Defendants—were already well aware of the dangers of skimming at that time.

43.     Neither the proposed rule nor the adopting release explained why the USDA decided to further limit eligibility for replacement benefits, or why it eliminated participants' right to replacement benefits that were stolen prior to receipt. Nor did either contain any analysis of the costs to the federal government of providing such replacement benefits, or the cost savings the SNAP program would enjoy by eliminating participants' access to the benefits they are legally entitled to receive. The regulatory statement said only: "Throughout 7 CFR part 274, the Department is deleting language and several sections which directly address *State agency responsibilities* regarding issuance, replacement, storage, shipping, inventory management, reconciliation, and reporting requirements for paper coupons." Supplemental Nutrition Assistance Program, Regulation Restructuring: Issuance Regulation Update and Reorganizations to Reflect

the End of Coupon Issuance Systems, 75 Fed. Reg. 18,377 (Apr. 12, 2010) (emphasis added). USDA did not offer any justification for replacing the old version of § 274.6 with the new, dissimilar version of the rule.

44.    Skimming was already a well-known and pervasive problem at the time § 274.6 was replaced. Skimming has existed since at least since 2002, when news outlets began reporting on tiny devices that could "record[] the names, account numbers and other identifying information from the magnetic stripes to be downloaded onto a personal computer later." Sue Chan, *Is Your Credit Card Being Skimmed?* CBS News (Dec. 6, 2002), https://www.cbsnews.com/news/is-your-credit-card-being-skimmed/. In 2003, thieves famously skimmed more than $200,000 in one day from unsuspecting customers at a deli in New York City. Laura Italiano, *Shock Scam Rips off ATM Users; 225G Scam Shocks Deli ATM Users,* NY Post (Dec. 3, 2003), https://nypost.com/2003/12/03/shock-scam-rips-off-atm-users-225g-scam-shocks-deli-atm-users/. Indeed, according to ABC News, in 2009, the U.S. Secret Service estimated that annual losses from ATM skimming total about $1 billion each year. Ki Mae Heussner, *ATM Skimming 101: How to Keep Safe*, ABC News (Apr. 27, 2009), https://abcnews.go.com/Technology/Business/story?id=7434509&page=1. By 2010, the technology available to skimmers had become far more advanced, and they began using "keypad overlays, which fit just on top of the original keypad and make note of which numbers are pushed for which transactions." Ashley Feinberg, *The Evolution of ATM Skimmers*, Gizmodo (Aug. 27, 2014), https://gizmodo.com/the-terrifying-evolution-of-atm-skimmers-1626794130.

45.    In recent years, banks and card-issuers have introduced chip and "tap-to-pay" cards that make it significantly more difficult to skim consumers' debit and credit cards. By contrast, the USDA has never required chip or "tap-to-pay" cards for SNAP participants or taken efforts itself

to protect program participants against electronic fraud. Rather, USDA has left it to the States to protect against fraud and abuse and take evolving technology and industry standards into account in administering what is a federal program. *See, e.g.,* 7 C.F.R. § 274.1(a) (2016) (directing that "[s]tate agencies shall establish issuance and accountability systems which ensure that only certified eligible households receive benefits; that Program benefits are timely distributed in the correct amounts; and that benefit issuance and reconciliation activities are properly conducted and accurately reported to FNS"); 274.8(b) (2020) (providing that "the State agency shall ensure that the EBT system meets performance and technical standards in the areas of system processing speeds, system availability and reliability, system security, system ease-of-use, minimum card and terminal requirements, performance bonding, and a minimum transaction set").

### 2023 Appropriations Act

46.    In December 2022, as part of the "Consolidated Appropriations Act, 2023" (the "2023 Appropriations Act"), Congress enacted provisions intended to prevent EBT benefit fraud. 2023 Appropriations Act, H.R. 2617, 117th Cong. § 501(b) (2023).

47.    Section 501(b) of the 2023 Appropriations Act directs the USDA to require States "to replace benefits that are determined by the State agency to have been stolen through card skimming, card cloning, or similar fraudulent methods." *Id.*

48.    But the Act limits the requirement to replace stolen benefits to only those stolen after October 1, 2022, and caps replacement to two months' worth of benefits and only two replacements per year. *Id.* § 501(b)(2).

49.    The 2023 Appropriations Act directs State agencies to submit a plan to the USDA within 60 days of the statute's enactment date.

50.     The statute also directs USDA to issue regulations directing States to adopt appropriate security measures to prevent card skimming, cloning and similar types of theft.

51.     The 2023 Appropriations Act left intact § 2016(h)(7) of the SNAP Act that requires that EBT cardholders be entitled to the same replacement of benefits rules enjoyed by coupon holders.

52.     The 2023 Appropriations Act takes some measures toward protecting SNAP participants from fraud and abuse, but falls far short of what is needed. Because many Plaintiffs' benefits were stolen prior to October 1, 2022, and because many lost more than two months' worth of benefits, they are not able to benefit from the Act's new provisions. And because skimming is rampant, Plaintiffs will not be made whole for losses they are not responsible for and cannot control. The courts are the only recourse these Plaintiffs have to recover the benefits they depend on to survive.

## **FACTUAL ALLEGATIONS**

### **Use of EBT Cards to Purchase Food with SNAP in New York State**

53.     SNAP program participants in New York use an EBT card issued by OTDA to access SNAP benefits for the purchase of food from authorized retailers. The EBT benefits are "issued from and stored in a central databank" and the SNAP participants can receive the benefits only by "electronically access[ing them] . . . at the point of sale." 7 U.S.C. § 2016(h)(11). At the point of sale, participants swipe their EBT card, enter their PIN, and then complete their purchase. *Electronic Benefits Transfer (EBT) Card*, Office of Temp. & Disability Assistance, https://otda.ny.gov/workingfamilies/ebt/ (last visited Jan. 25, 2023).

54.     Behind the scenes, when the participant swipes her card, account information stored on the magnetic stripe interfaces with a central database which enables the availability of funds to be verified, the participant's balance to be debited, and the appropriate amount to be credited to

the retailer's bank account. The relevant state's EBT contractor is ultimately responsible for paying the retailer. Office of Mgmt. & Budget, Exec. Office of the President, OMB, 2 CFR Part 200, Appendix XI: Compliance Supplement, 179 (Apr. 2022), https://www.whitehouse.gov/wp-content/uploads/2022/05/2022-Compliance-Supplement_PDF_Rev_05.11.22.pdf.    The    EBT contractor's "concentrator bank" makes the payment via the National Automated Clearing House (ACH) system and is reimbursed for the payments from the state's EBT benefit account with the United States Treasury. *Id*.

55.     SNAP program participants can check to see when benefits are credited to their account to use and the balance available in several ways: by (a) checking their local welfare agency account online or through a mobile application (in New York City this is called "AccessHRA"); (b) calling the number on the back of their EBT card; or (c) checking the balance on their EBT card at an ATM. Participants' ability to know the balance of their SNAP benefits at any given time enables them to manage their budgets, and because SNAP participants are, by definition, lower-income individuals, their budgets are usually tight.

56.     Where a SNAP participant does not use the benefits within nine months of the date they were credited to their SNAP balance, the benefits are revoked. *AskUSDA; Do Supplemental Nutrition Assistance Program Benefits Expire?*, U.S. Dep't of Agric. (Jan. 24, 2022), https://ask.usda.gov/s/article/Do-Supplemental-Nutrition-Assistance-Program-benefits-expire.

57.     In other words, the participant has access to a government administered SNAP account with a certain balance at any given moment available for use with a merchant, but the participant does not have physical control of the benefits themselves, as they once did when Food Stamp coupons were delivered to them in the mail. SNAP benefits cannot be withdrawn, downloaded, printed out, or deposited in the participant's personal bank account. Rather, the

benefits must remain in the government-controlled account, where they are vulnerable to skimming and other forms of theft. Only when participants purchase food using their cards do they receive their benefits and the danger of electronic theft is eliminated.

### "Skimming" and the Federal and State Agency Response

58.     Skimming occurs when perpetrators place a skimming device on an ATM or point-of-sale device. Skimming devices are extremely hard to detect—for both the customer and the owner/lessor of the ATM and point of sale device—and have become increasingly more sophisticated. Typically, these devices take the form of physical overlay devices with Bluetooth technology and are designed to look exactly like the underlying device. For example, in a retail store, thieves often install a false, Bluetooth-enabled cover designed to look exactly like a debit card reader over a real debit card reader. Because these devices look exactly like real debit card readers, they are very difficult for both customers and retailers to detect.

59.     Once perpetrators have gained access to the device, they are able to steal (skim) and then remotely transmit card/PIN information to an offsite location. Typically, perpetrators use the data to create a duplicate version of the card which then enables remote access to the compromised account. *See* General Information System Message from Valerie Figueroa, Deputy Comm'r Emp. and Income Support Programs, Office of Temp. and Disability Assistance, Skimming & Phishing: EBT Scams Currently Impacting Recipient Households, 2 (Oct. 27, 2022), https://otda.ny.gov/policy/gis/2022/22DC097.pdf.

60.     Since skimming devices simply transmit information and otherwise allow legitimate EBT transactions to proceed unimpeded, targeted retailers and victims are typically unaware that theft has occurred until their next attempted purchase or account balance review—after their account has already been compromised.

61.     Under OTDA's policy, skimming victims are instructed to report skimming to the local district and in New York City the local district is the New York City Human Resources Administration (HRA). *See EBT Scam Alert*, Off. of Temp. & Disability Assistance, https://otda.ny.gov/workingfamilies/EBT-scam-alert.asp (last visited Feb. 2, 2023).

62.     Notably, chip cards used with chip readers are less vulnerable to skimming. However, to-date, defendant USDA FNS has not issued regulations or established standards regarding the use of chips in EBT cards, even though the use of chip cards has become industry-standard and would maximize security in compliance with statutory standards pertaining to USDA-FNS. *See* 7 U.S.C. § 2016(h)(2)(c)(i).

63.     Upon information and belief, there has been an increased incidence of skimming of EBT benefits. *See* General Information System Message from Valerie Figueroa, Deputy Comm'r Emp. and Income Support Programs, Office of Temp. and Disability Assistance, Skimming & Phishing: EBT Scams Currently Impacting Recipient Households (Oct. 27, 2022), https://otda.ny.gov/policy/gis/2022/22DC097.pdf. The latest OTDA data available for the period January 2022 through the first half of February 2023 indicates that $4,649,158.77 in SNAP benefits were skimmed. In addition, another $1,352,507.84 in cash benefits were skimmed from low-income people in New York. Combined, these benefits represent 10,679 instances of skimming. The majority of the benefits skimmed during this period came from households residing in New York City. In October 2022, Defendants issued two alerts regarding skimming. These alerts acknowledge the harm that skimming has been causing SNAP participants and list steps that they can take to try to prevent skimming, but they do not mention anything about the replacement of benefits. *See SNAP EBT Card Skimming Scam Alert 10/19/2022*, U.S. Dep't of Agric. (Oct. 19, 2022), https://www.fns.usda.gov/snap/scam-alerts; *see also* Policy Memo from Cynthia Long,

Adm'r of Food & Nutrition Services, & Ann Flagg, Dir. of the Office of Family Assistance, SNAP and TANF Electronic Benefit Transfer (EBT) Card Skimming Prevention –Tools and Resources (Oct. 31, 2022), https://www.fns.usda.gov/snap/snap-tanf-ebt-card-skimming-prevention.

64.     On January 31, 2023, Defendants issued new policy guidance on skimming to States, as the 2023 Appropriations Act requires. Policy Memo from Tim English, Acting Assoc. Adm'r of Supplemental Nutrition Assistance Program, Replacement of SNAP Benefits in the Consolidated            Appropriations         Act        of        2023        (Jan.        31,        2023), https://www.fns.usda.gov/snap/replacement-snap-benefits-consolidated-appropriations-act-2023. The guidance directs States to submit plans to Defendants to "address how state agencies will process household claims of stolen benefits" but this new guidance does not apply to Plaintiffs, whose benefits were stolen prior to October 1, 2022, or to losses exceeding more than two months' worth of benefits. *Id*. Nor does it change the regulation 7 C.F.R. § 274.6, which limits States' ability to replace benefits where "the household reports that food purchased with [SNAP] benefits was destroyed in a household misfortune," 7 C.F.R. § 274.6(a)(1) (2013), or where the household informs the agency that their EBT card has been lost or stolen, 7 C.F.R. § 274.6(b)(2) (2013).The limitations that Defendants impose on replacement of full value of stolen EBT benefits remain in force.

65.     USDA-FNS's guidance is consistent with its unlawful regulation which does not authorize States to replace SNAP benefits stolen by skimming or accept liability for replacing benefits. The USDA-FNS policy is contrary to the command of Congress in 7 U.S.C. § 2016(h)(7) that it adopt regulations similar to those that pertained to the replacement of paper coupons. *See* 7 C.F.R. § 274.6 (1989) (former regulation).

66.    Were Defendants' policy with respect to skimming "similar to" the pre-EBT form of 7 C.F.R. § 274.6, as required by 7 U.S.C. § 2016(h)(7), it would authorize States to replace SNAP benefits stolen by skimming because in such circumstances the benefits are stolen prior to the participants' receipt of such benefits. The States would not be liable for replacement of the skimmed benefits under such circumstances.

67.    Skimmed SNAP benefits are stolen prior to the participant's receipt. Receipt occurs at the point in time that the participant successfully uses the EBT card to purchase food. Given that skimming deprives participants of the ability to complete a successful purchase by depleting the value of benefits left for the participants to use, benefits stolen by skimming – like paper coupons stolen from the mail – are stolen prior to the participants' receipt of those benefits. Therefore, if the current version of 7 C.F.R. § 274.6 were indeed similar to the prior version, as Congress required, skimming would be an instance in which States are authorized to replace stolen benefits. The current regulation, however, does not authorize such replacement, and is therefore not "similar to" the prior version of 7 C.F.R. § 274.6 as required by 7 U.S.C. § 2016(h)(7).

68.    In response to the recent epidemic of skimming, OTDA issued a message on October 27, 2022, stating, "The United States Department of Agriculture, Food and Nutrition Service (USDA-FNS) prohibits replacing stolen SNAP benefits using federal funds. Additionally, stolen/skimmed SNAP benefits cannot be replaced even if a reported case of skimming is confirmed." General Information System Message from Valerie Figueroa, Deputy Comm'r Emp. and Income Support Programs, Office of Temp. & Disability Assistance, Skimming & Phishing: EBT Scams Currently Impacting Recipient Households, 3 (Oct. 27, 2022), https://otda.ny.gov/policy/gis/2022/22DC097.pdf. The policy also says that the agency's cash benefits cannot be used to replace the amount of SNAP benefits skimmed. *Id.*

69.     In failing to issue regulations authorizing the replacement of full value of the SNAP benefits stolen via skimming, and declining to authorize the replacement of those benefits, Defendants have acted contrary to law and arbitrarily and capriciously, thereby causing States to inappropriately deny replacement benefits to victims of skimming.

## PLAINTIFF FACTS

**Haiyan Chen**

71.     Haiyan Chen is a 42-year-old single parent and the sole source of financial support to four minor children, ages 7, 9, 12, and 16. She works as a server in a restaurant and earns $21-22,000 a year. She lives with her children in Brooklyn, New York.

72.     In June 2022, Ms. Chen went to Costco to purchase food for her household. Just few weeks prior, Ms. Chen had received P-EBT benefits for her four children. These benefits, in addition to regular SNAP benefits, serve as a critical supplement to her family's food security.

73.     Ms. Chen was able to complete the purchase at Costco, but when she returned home, she noticed her receipt stated that there was a $2 balance in her EBT account. Two days earlier, the amount was $3,900—far more than she had spent at Costco—and Ms. Chen had not used her card since.

74.     Ms. Chen observed through the SNAP mobile application (AccessHRA) that her benefits were spent in Los Angeles, California. Ms. Chen was shocked, and immediately reported the theft to HRA by calling the number on her EBT card, only to be told there was no way for her benefits to be replaced. Ms. Chen was also told her only recourse was to request a new card and change her PIN, which she did.

75.     Ms. Chen reported the benefits stolen to her local police precinct, but there was no subsequent follow up.

76.     After her benefits were stolen, Ms. Chen experienced extreme distress and shock. She turned to charities for food donations, lined up outside of a church far from home, and relied on excess food spared by a friend. She stopped buying fresh food and fish for her family, and only purchased heavily discounted food, even though it meant walking to a store 30 minutes from home instead of ten. Ms. Chen continues to have trouble eating and sleeping due to the fear and anxiety caused by losing the critical funds needed to feed her children.

**Kenya Watson**

77.     Plaintiff Kenya Watson is 49 years old. She lives in Brooklyn, New York. Ms. Watson's only source of income is Social Security Disability benefits, which she also uses to provide support for her adult daughter and her 15-year-old grandchild.

78.     In July 2022, Ms. Watson visited her local grocery store to purchase food for a much-anticipated family barbeque, after carefully budgeting her SNAP benefits for the month. Ms. Watson was shocked when her card was declined, and she learned that only three cents remained in her account. Ms. Watson had no choice but to leave the grocery store without food for her barbeque or funds to purchase food for the rest of the month.

79.     Using the SNAP mobile application, Ms. Watson confirmed her card was used at a Walmart in California, and in unfamiliar locations in Brooklyn, New York. In total, $612.97 of SNAP benefits were stolen.

80.     Ms. Watson called the number on the back of her EBT card for assistance and requested the card be suspended. When Ms. Watson visited the HRA office for additional assistance, she was told nothing could be done until she obtained a police report. Ms. Watson visited the 75th Precinct to file a police report.

81.     Ms. Watson returned to HRA to provide the police report. She informed staff that she had only mere cents remaining on the card and needed additional funds to purchase food. She was advised to find a food pantry and a school that served breakfast and lunch for her grandchild.

82.     Due to the theft, Ms. Watson's household experienced a food shortage for the remainder of the month. Ms. Watson relies on SNAP benefits to provide meals for her household, as the rest of her income is almost entirely consumed by rent and utilities. Despite receiving food donations from relatives, her household reduced their consumption to one meal per day to get by. Ms. Watson fears that this theft will occur again, which is a source of tremendous anxiety.

**S.O.**

83.     Plaintiff S.O. is 26 years old and the sole caretaker to an almost two-year-old son. In February 2022, she fled her home due to domestic violence and entered the New York City shelter system. She currently lives in a domestic violence shelter in New York City. She works at a grocery store as a clerk part time.

84.     In March 2022, S.O. visited her local grocery store, the same store where she works, to purchase food for her household. When she attempted to complete the transaction, her card was declined. S.O. was confused; when she had last checked her SNAP balance, she had $459.00 in her account. She immediately consulted her SNAP mobile application, which showed a $0 balance. Using the mobile app, S.O. could see purchases were made with her benefits at Sam's Club in Texas.

85.     After confirming the theft, S.O. immediately called the number on the back of her EBT card for assistance and was advised to obtain a police report and to request a fair hearing. S.O. attempted to file police reports at two separate precincts, but officers at both locations refused to take her report of the theft.

86.     S.O. went to her local HRA center for assistance where she was misinformed that her stolen benefits could be reissued if she prevailed in a fair hearing. S.O. requested a fair hearing but was subsequently informed by a caseworker that HRA policy prohibits the reissuance stolen funds. S.O. missed a day of work attempting to get her benefits reissued.

87.     Due to the theft, S.O.'s household became food insecure. She relied on food donations from family members. She also used Special Supplemental Nutrition Program for Women, Infants, and Children (WIC) benefits to buy food, however, the WIC program significantly limits the type of food items that can be purchased. Because of these restrictions, S.O. was unable to buy Lactaid milk for her son who is lactose intolerant.

**Gertrude Cribbs**

88.     Plaintiff Gertrude Cribbs is 71 years old and the sole companion to her 95-year-old sister. Ms. Cribbs and her sister live together, and both rely on the assistance of home health aides to complete daily tasks, like preparing food, dressing and going to the grocery store. Ms. Cribbs' only source of income is Supplemental Security Income (SSI). She is a breast cancer survivor and has been in remission for one year. Ms. Cribbs lives in Queens, New York.

89.     In August 2022, Ms. Cribbs visited her local grocery store to buy food for her household. Ms. Cribbs' EBT card was declined when she tried to complete her usual grocery errand.

90.     Just two days earlier, Ms. Cribbs confirmed that her balance was $436.00. Ms. Cribbs realized immediately that her benefits had been stolen. She visited the 103rd Precinct and filed a police report but has not been contacted by the police since. She then went to her HRA center where a case handler reviewed her transaction history and learned her balance was just $30. She also discovered her card information was used to make purchases in California. The case handler informed

Ms. Cribbs they could not reissue the stolen funds. Ms. Cribbs requested a new card and changed her PIN.

91.     In December 2022, Ms. Cribbs went to purchase groceries with the help of her aide. When Ms. Cribbs attempted to pay for the food, her card was declined. Despite obtaining a new card and PIN number, she discovered she was a victim of SNAP theft for a second time. She lost $436, the entire balance of her SNAP account. Ms. Cribbs sought assistance from HRA but was told that if emergency funds were issued, she would be responsible for repayment.

92.     Following the second instance of theft, Ms. Cribbs was once again left without funds to purchase food. Her case manager at a local nonprofit organization provided a $50 food voucher that could only be spent at a grocery store a significant distance from Ms. Cribbs' home. Due to Ms. Cribbs' health, she had to wait for help from her home health aide to travel to the store to purchase food.

93.     Ms. Cribbs experienced theft twice despite regularly changing her PIN number. The theft caused a food shortage and stress for Ms. Cribbs' household. Without food donations and an emergency food voucher, Ms. Cribbs and her sister would not have been able to eat. Ms. Cribbs now lives in fear that her benefits will be stolen again.

**Hana Broome**

94.     Plaintiff Hana Broome is 43 years old and has six children, ages 6, 7, 8, 12, 19 and 25. Two of Ms. Broome's minor children have disabilities and receive SSI. She lives in public housing in Upper Manhattan with her five younger children and partner.

95.     Ms. Broome is the president of the Parent Teacher Association at her younger children's school. In November 2022, while preparing to volunteer at a school event to celebrate school attendance, and a few hours after confirming her account balance, Ms. Broome discovered at

a grocery store ATM that approximately $2,000 in SNAP and P-EBT benefits and $143 in cash benefits were drained from her account. With the entire balance of her account gone, Ms. Broome had no means to purchase food and was forced to leave the grocery store empty handed.

96.     Using the SNAP mobile application on her phone, Ms. Broome confirmed that her benefits had been spent in North Carolina.

97.     Ms. Broome reported the benefits stolen to HRA but was told nothing could be done to replace them; she was issued a new card and told to change her PIN. The police took her report of the theft, but also conveyed nothing could be done to get Ms. Broome's benefits back. They have not followed up since.

98.     After her benefits were stolen, Ms. Broome and her family experienced a food shortage. The theft occurred right before the holidays, impacting Ms. Broome's ability to provide much-anticipated holiday meals for her family. She was forced to seek assistance from a local pantry and received donations through her children's school. Because she did not have sufficient funds to purchase food for her kids to have after school, Ms. Broome used money for rent to purchase food. The experience has also caused Ms. Broome immense stress and has left her feeling constantly vulnerable to having her benefits stolen again.

**Mei Ieng Lee**

99.     Plaintiff Mei Ieng Lee is a 77-year-old widow. She lives by herself in an apartment for seniors in Brooklyn, New York. Ms. Lee's only source of income is SSI.

100.    In August 2022, Ms. Lee went with her home health aide to buy groceries from several local stores in Sunset Park, Brooklyn. Due to Ms. Lee's arthritis and other mobility issues, she needs assistance with daily tasks. She had received around $340 in SNAP benefits for the month. After buying some fruit, Ms. Lee learned from her receipt that she only had a balance of $12 in her

account. With $297 stolen, her entire food budget for the month, she was unable to complete her shopping and purchase the groceries needed to prepare meals.

101.    Ms. Lee called 911 to report the benefits stolen but was given different numbers to contact instead. Ms. Lee speaks Cantonese, and because of the confusing information about what to do and the language barrier, she was unable to report the stolen benefits to HRA. She had to wait a month for her son to assist her in getting a replacement EBT card.

102.    After her benefits were stolen, Ms. Lee did not have any money to spend on groceries for the month. During that period, she had to ask her son for money to buy food, cut back on meals and ate less meat and fish to save money.

103.    Since the skimming incident, Ms. Lee has felt frustrated with the lack of help from the government and feels the government has not implemented adequate security measures to keep benefits protected.

## CLASS ALLEGATIONS

104.    Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2) on behalf of themselves and a class of all others similarly situated, defined as:

> all New York State residents who since January 1, 2022, have been the victims of the skimming of SNAP benefits (including P-EBT benefits) or will be the victims of the skimming of such benefits and who have not had, or will not have had, their full value of their stolen benefits replaced by the City, State, or federal government.

105.    This class is so numerous that joinder of all members is impracticable. On information and belief, thousands of households who have been victims of EBT skimming in New York State during the past year.

106.    There are questions of fact and law common to the class, including but not limited to, whether defendant USDA-FNS's policy not to authorize States to replace benefits lost due to skimming violates 7 U.S.C. § 2016(h)(7), in violation of the APA.

107.    The named Plaintiffs' claims are typical of the claims of the class in that each has been the victim of skimming and has been denied replacement benefits for the benefits stolen as a result.

108.    Declaratory and injunctive relief are appropriate with respect to the class as a whole because Defendants have acted on grounds applicable to the class.

109.    The named plaintiffs and the proposed class are represented by The Legal Aid Society and Freshfields Bruckhaus Deringer US LLP, whose attorneys are experienced in class action litigation and will adequately represent the class.

110.    A class action is superior to other available methods for a fair and efficient adjudication of this matter in that the prosecution of separate actions by individual class members would unduly burden the Court and create the possibility of conflicting decisions.

## CAUSES OF ACTION

### COUNT ONE

### (Violation of the APA § 706(2))

111.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

112.    The APA, 5 U.S.C. § 706(2), prohibits federal agency action that is, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right"; or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

113.    USDA and FNS are each an "agency" under the APA. 5 U.S.C. § 551(1).

114.    By adopting policies and regulations that do not authorize States to reimburse victims of skimming, Defendants are acting contrary to the statutory command of

7 U.S.C. § 2016(h)(7) which requires replacement of electronic SNAP benefits stolen prior to receipt as was required for paper coupons, and that the Defendants accept liability for the replacement of such skimmed benefits.

115.    Defendants have taken action "not in accordance with law," in violation of the APA.

116.    By adopting unexplained policies and regulations that do not authorize States to replace SNAP benefits stolen via skimming, in contravention of Congress' explicit direction, the agencies have acted arbitrarily and capriciously in violation of the APA.

117.    Defendants' violations have caused and will continue to cause ongoing harm to the individual Plaintiffs and the Plaintiff class.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that the Court:

a. Certify a class consisting of all New York State residents who since January 1, 2022 have been the victims of the skimming of SNAP benefits or P-EBT benefits or will be the victims of the skimming of SNAP benefits or P-EBT benefits and who have not had their full value of their stolen benefits replaced by the City, State, or federal government;

b. Issue a declaration that Defendants violated the APA by acting contrary to law and arbitrarily and capriciously;

c. Issue an injunction enjoining Defendants from refusing to replace (or allowing the States to replace) SNAP benefits and P-EBT benefits stolen by skimming pursuant to 7 C.F.R. § 274.6;

d. Issue an injunction commanding Defendants to authorize the replacement of stolen benefits for the individual Plaintiffs and the Plaintiff class, consistent with federal law;

e. Award Plaintiffs their costs and attorneys' fees pursuant to 5 U.S.C. § 504 and 28 U.S.C. § 2412(d); and

f. Grant such additional or further relief as the Court considers just and proper.

Dated:        February 21, 2023
              New York, New York                    Respectfully submitted,

                                                    FRESHFIELDS BRUCKHAUS
                                                    DERINGER US LLP
                                                    /s/ Mary Eaton
                                                    Mary Eaton
                                                    Umer Ali
                                                    Maria Slobodchikova
                                                    601 Lexington Avenue, 31st Floor
                                                    New York, New York 10022
                                                    tel. (212) 277-4000
                                                    e-mail: mary.eaton@freshfields.com
                                                    umer.ali@freshfields.com
                                                    maria.slobodchikova@freshfields.com

                                                    THE LEGAL AID SOCIETY

                                                    Judith Goldiner
                                                    Edward Josephson
                                                    Alex MacDougall
                                                    Civil Law Reform Unit 199 Water Street,
                                                    3rd Floor
                                                    New York, New York 10038
                                                    tel. (212) 577-3300
                                                    e-mail: JGoldiner@legal-aid.org
                                                    ejosephson@legal-aid.org
                                                    amacdougall@legal-aid.org

                                                    Susan Welber
                                                    Government Benefits Unit
                                                    Bronx Neighborhood Office – Civil Practice
                                                    260 East 161st Street, 8th Floor
                                                    Bronx, New York 10451
                                                    e-mail: sewelber@legal-aid.org


                                                    *Attorneys for Plaintiffs*