UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8/28/2025
```

-----------------------------------------------------------X
HAIYAN CHEN, KENYA WATSON, S.O.,          :
GERTRUDE CRIBBS, HANA BROOME, and         :
MEI IENG LEE, individually, and on behalf of all :
similarly situated,                       :
                              Plaintiffs, :          23-CV-1440 (VEC)
                                          :
      -against-                           :          OPINION AND ORDER
                                          :
BROOKE L. ROLLINS, in her official capacity as :
Secretary of the U.S. Department of Agriculture :
(USDA), and JAMES C. MILLER, in his official :
capacity as Acting Administrator of the USDA :
Food and Nutrition Service,               :
                                          :
                              Defendants. :
-----------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

Haiyan Chen, Kenya Watson, S.O., Gertrude Cribbs, Hana Broome, and Mei Ieng Lee

(collectively, "Plaintiffs"), individually and on behalf a putative class of those similarly situated,

brought this action pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et*

*seq.*, against Brooke L. Rollins and James C. Miller in their official capacities as Secretary of the

U.S. Department of Agriculture ("USDA") and Acting Administrator of the USDA Food and

Nutrition Service ("FNS"), respectively (collectively, "Defendants"). Plaintiffs claim that

Defendants' policy of prohibiting replacement of Supplemental Nutrition Assistance Program

("SNAP") benefits stolen through a practice known as "skimming" (a form of electronic theft) is

arbitrary, capricious, and contrary to law in violation of the APA. *See* 5 U.S.C. § 706(2). The

parties cross-moved for summary judgment. For the following reasons, Plaintiffs' motion for

summary judgment is DENIED, and Defendants' motion for summary judgment is GRANTED.

# BACKGROUND[1]

Plaintiffs receive SNAP benefits and lost benefits to skimming.  On summary judgment, Plaintiffs assert two agency actions are arbitrary and capricious: 7 C.F.R. § 274.6 (the "2010 Regulation"); and a more general policy prohibiting replacement of skimmed SNAP benefits with federal funds (the "2022 Policy").

## I.    History of SNAP and the USDA's Reimbursement Policies

In the Food Stamp Act of 1964, Congress established a "food stamp program" to enable low-income households to afford a more nutritious diet.  CHEN1–7.  Under the program, eligible households received coupons with which to purchase food from retail food stores.  CHEN1.  The legislative history since then has reflected the push and pull in Congress between the desire to help the needy get adequate nutrition and the concern that the program is subject to fraud.[2]

Animated at least in part by a concern for fraud in the food stamp program, in early 1981 the USDA proposed a new rule as part of its re-examination of the procedures for the replacement of lost, stolen, or destroyed coupons.  46 Fed. Reg. 8935; CHEN37.  The USDA contemplated that the proposed rule would allow replacement of "coupons within limits that restrict[ed] opportunities for fraud and abuse."  CHEN37.  The proposed rule permitted replacement of coupons "lost in the mail prior to receipt" but limited a household to one replacement of coupons every six months for coupons destroyed or stolen subsequent to receipt.

---

[1]    The facts discussed in this section are based on the administrative record except where otherwise noted. Citations to the Certified Administrative Record, Dkt. 51, omit hyphens and placeholder zeroes (e.g., CHEN1).

[2]    Congress and the USDA have sought to strike that balance despite the relatively rare incidence of fraud perpetrated by program recipients.  *See* RANDY ALISON AUSSENBERG, CONG. RSCH. SERVS., IF10860, SUPPLEMENTAL NUTRITION ASSISTANCE PROGRAM: ERRORS AND FRAUD (Apr. 7, 2025), available at https://www.congress.gov/crs-product/IF10860 (last accessed Aug. 27, 2025) ("SNAP fraud is rare, according to available data and reports, but there is no single data point that reflects all the forms of fraud in SNAP.").

CHEN39.  The agency recognized that "households have little control over the nondelivery of mail," but losses "after receipt . . . are subject to greater control by the household."  CHEN38.

FNS received several comments opposing the proposed policy of replacing coupons destroyed or stolen after receipt.  CHEN44.  Apparently swayed by those comments, the final rule adopted by FNS in October 1981, 46 Fed. Reg. 50277, changed course, explaining that "[t]he concept of replacing welfare benefits which have been lost or stolen after they have been received by the participant [is] not common in Federal assistance programs."  CHEN44.  The agency referenced another benefits program that permitted replacement of stolen checks but not cash stolen from recipients after they had cashed the checks, reasoning that "[w]hen a check is cashed the money becomes the recipient's responsibility."  *Id.*  In the same vein, the USDA took the position "that a recipient should be responsible for coupons once the recipient has the coupons" in order "to better control program accountability."  *Id.*  The USDA adopted that position expressly acknowledging that such a policy would "cause a hardship for those participants whose coupons really are stolen."  *Id.*; *see also* CHEN50–51, codified at 7 C.F.R. § 274.3 (1981).

Also in 1981, Congress amended Section 7(f) of the Food Stamp Act to hold State agencies "strictly liable" to the USDA "for any financial losses involved in the acceptance, storage, and issuance of coupons."  CHEN61 at Sec. 1312.  But, as to "losses resulting from the issuance and replacement of authorizations for coupons . . . sent through the mail," State agencies were only liable to the USDA "to the extent prescribed in the regulations promulgated by the Secretary."  *Id.*

In 1990, Congress permitted States, subject to USDA approval, to implement an electronic benefit transfer ("EBT") system to provide SNAP benefits.  CHEN92.  The EBT

program would issue and store benefits from a central data bank that households could access at the point-of-sale ("POS") using an electronic card (similar to an ATM card). *Id.* at Sec. 1729. Recognizing the change in modality for providing this nutritional assistance, FNS proposed rules explaining that "[t]he State agency remains responsible for issuance losses in an EBT system the same as it is in a coupon issuance system. The Department has no authority to pay for . . . lost or stolen benefits after a household receives them." CHEN137. The final rule, codified at 7 C.F.R. § 276.2(b)(7), held States strictly liable for over-issuances of benefits, including "replacement benefits [issued] to a household's account due to [un]authorized use of the benefits in a household's account." CHEN189–90. In 1996, Congress specified that regulations issued by the USDA "regarding the replacement of benefits and liability for replacement of benefits under an [EBT] system shall be similar to the regulations in effect for a paper-based food stamp issuance system." CHEN213 at Sec. 825(a)(7).

Congress further modernized the food stamp program in 2008 when it passed the Food and Nutrition Act of 2008. *See* CHEN236–410. Congress found "that the limited food purchasing power of low-income households contributes to hunger and malnutrition." CHEN237. "To alleviate such hunger and malnutrition," Congress established SNAP to "permit low-income households to obtain a more nutritious diet through normal channels of trade by increasing food purchasing power." *Id.* As to replacement of benefits, Congress held State agencies strictly liable "for any financial losses involved in the acceptance, storage and issuance of benefits," except for "losses resulting from the issuance and replacement of authorizations for benefits which are sent through the mail." CHEN287 at Sec. 7(e), codified at 7 U.S.C. § 2016(e).

Congress directed the USDA to issue regulations "regarding the replacement of benefits and liability for replacement of benefits under an [EBT] system" that would be "similar to the regulations in effect for a paper-based supplemental nutrition assistance issuance system." CHEN291 at Sec. 7(h)(7), codified at 7 U.S.C. § 2016(h)(7). At the time, regulations required State agencies to replace coupons that "were not received in the mail, were stolen from the mail, were destroyed in a household misfortune, or were improperly manufactured or mutilated," but not coupons "lost, stolen or misplaced after receipt." 7 C.F.R. §§ 274.6(a)(1)(ii), (a)(2) (1999).

In April 2010, FNS issued a direct final rule, 75 Fed. Reg. 18377, changing SNAP regulations to respond to the replacement of the paper coupon system with the EBT system. CHEN411. That rule, adopted without change in December 2010, CHEN428, gave rise to the 2010 Regulation (i.e., 7 C.F.R. § 274.6) that Plaintiffs are challenging. CHEN422. The 2010 Regulation allows "replacement issuances" for "food purchased with Program benefits [that] was destroyed in a household misfortune," *id.*, and replacement of EBT cards that are "lost or stolen," *id.*,[3] but does not provide for replacement of stolen benefits.

In Section 501 of the Consolidated 2023 Appropriations Act, H.R. 2617, 117th Cong. § 501 (2022) ("2023 Appropriations Act"), Congress recognized the problem of card skimming. CHEN432. It directed the USDA to issue guidance to State agencies on security measures to detect and prevent theft from card skimming. *Id.* Congress also required States to use federal funds to replace benefits stolen between October 1, 2022, and September 30, 2024, through skimming. CHEN433–34 at Sec. 501(b), (b)(2)(C). Congress specifically noted that such

---

[3]    The current version of the regulation permits replacement of EBT cards that are "lost, stolen, or damaged." 7 C.F.R. § 274.6(b).

replacement benefits "shall not be regarded as losses for the purpose of section 7(e) of the Food and Nutrition Act of 2008." CHEN434 at Sec. 501(b)(4).

## II.    Extra-Record Evidence

Plaintiffs submitted extensive extra-record evidence in support of their motion for summary judgment. That evidence consists of: (1) background materials on State administration of SNAP, *see* Slobodchikova Decl., Dkt. 65, Exs. A and B, Dkts. 65-1 and 65-2;[4] (2) background materials on the functionality of EBT cards, *see* Ex. C, Dkt. 65-3; (3) background materials on skimming, including how such thefts occur, the prevalence of skimming, and how to prevent skimming, *see* Exs. D, H, I, J, K, L, M, T, V, W, X, Z, CC, Dkts. 65-4, 65-8, 65-9, 65-10, 65-11, 65-12, 65-13, 65-20, 65-22, 65-23, 65-24, 65-26, 65-29; (4) bulletins, messages, memoranda, alerts, guidance, and information from State and federal agencies pertaining to skimming, *see* Exs. E, F, G, O, P, Q, R, S, Y, Dkts. 65-5, 65-6, 65-7, 65-15, 65-16, 65-17, 65-18, 65-19, 65-25; (5) prior regulations of food stamps and coupons not included, though referenced, in the administrative record, *see* Exs. N, AA, Dkts. 65-14, 65-27; (6) a dictionary definition of "similar," *see* Ex. U, Dkt. 65-21; and (7) information on Plaintiffs' standing, *see* Ex. BB, Dkt. 65-28.

## III.    Procedural History

On February 22, 2023, Plaintiffs filed this lawsuit. *See* Compl., Dkt. 1. Plaintiffs moved for summary judgment, *see* Pl. Mem., Dkt. 66, and Defendants cross-moved for summary judgment, *see* Def. Mem., Dkt. 85.

---

[4]    Hereinafter, citations to Exhibits refer to the exhibits to the Slobodchikova Declaration.

## DISCUSSION

### I.  Standard of Review

A court will grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In general, a "party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists," and "when the burden of proof at trial would fall on the nonmoving party," the movant may "point to an absence of evidence on an essential element of the nonmovant's claim."  *Bustamante v. KIND, LLC*, 100 F.4th 419, 432 (2d Cir. 2024) (citation and internal quotation marks omitted).  The Court is required to resolve all ambiguities and draw all permissible factual inferences "in favor of the party against whom summary judgment is sought."  *Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 69 (2d Cir. 2015) (citation omitted).[5]

A case challenging agency action is typically amenable to disposition by summary judgment.  This is so because a court's "review of agency actions under the Administrative Procedure Act is narrow and deferential."  *Safe Haven Home Care, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 130 F.4th 305, 315 (2d Cir. 2025) (citation omitted).  Subject to certain exceptions,[6] review is "limited to examining the administrative record to determine whether the agency decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Kakar v. U.S. Citizenship & Immigr. Servs.*, 29 F.4th 129, 132 (2d Cir. 2022) (citation omitted).  Agency actions are only set aside pursuant to the APA if they are

---

[5]    Where, as here, the parties cross-move for summary judgment, a court must apply the same standard and examine each party's motion "on its own merits," drawing all reasonable inferences "against the party whose motion is under consideration."  *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

[6]    Discussed in Section II *infra*.

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Pfizer, Inc v. U.S. Dep't of Health & Hum. Servs.*, 42 F.4th 67, 73 (2d Cir. 2022) (quoting 5 U.S.C. § 706(2)(A)). Due to the circumscribed administrative record and narrow scope of review, an APA challenge to an agency action often "presents a pure question of law," rendering "a district court's procedural decision to award summary judgment . . . generally appropriate." *Aleutian Cap. Partners, LLC v. Scalia*, 975 F.3d 220, 229 (2d Cir. 2020).

## II.    Consideration of Extra-Record Evidence

The APA requires the Court to "review the whole record or those parts of it cited by a party." 5 U.S.C. § 706. Thus, the "focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985) (citation omitted). The Second Circuit permits the "admission of extra-record evidence" where: (1) "there has been a strong showing in support of a claim of bad faith or improper behavior on the part of agency decisionmakers;" (2) "the absence of formal administrative findings makes such investigation necessary in order to determine the reasons for the agency's choice;" or (3) "the district court need[s] to supplement the record with background information in order to determine whether the agency considered all of the relevant factors." *Safe Haven Home Care*, 130 F.4th at 324 (quoting *Nat'l Audubon Soc. v. Hoffman*, 132 F.3d 7, 16 (2d Cir. 1997), then quoting *American Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008)).

Plaintiffs urge the Court to consider extra-record evidence in connection with their motion for summary judgment on the grounds that: (1) Defendants failed to consider certain of those materials when they promulgated the challenged agency actions; (2) certain documents support Plaintiffs' standing; and (3) certain materials confirm Defendants adopted the challenged policy. *See* Pl. Mem. at 2 n.1.

### A.  Evidence Regarding Failure to Consider an Important Part of the Problem

The Court concludes it cannot consider Plaintiffs' proffered extra-record evidence to determine whether the USDA failed to consider an important aspect of the problem by ignoring the threat of skimming when it implemented the challenged agency actions.  In *Safe Haven*, the Second Circuit declined to address whether extra-record evidence can be admitted where, as here, an agency faces allegations that it "entirely failed to consider an important aspect of the problem." *Id.* at 324 n.11 (citation omitted).  Several district courts in this Circuit, however, have considered, or contemplated considering, extra-record evidence in such circumstances.  *See Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 598 F. Supp. 3d 98, 106, 111–12 (S.D.N.Y. 2022); *New York v. U.S. Dep't of Com.*, 351 F. Supp. 3d 502, 632–35, 651–54 (S.D.N.Y. 2019), *aff'd in part, rev'd in part and remanded sub nom. Dep't of Com. v. New York*, 588 U.S. 752 (2019)); *In re 21st Birthday Denials of Special Immigrant Juv. Status Applications by USCIS*, No. 22-CV-1926 (GRB), 2023 WL 3949736, at *3 n.7 (E.D.N.Y. Feb. 10, 2023); *Saget v. Trump*, 375 F. Supp. 3d 280, 341–43 (E.D.N.Y. 2019).

A court considers extra-record evidence when disregarding such evidence would leave the court without an "adequate understanding" of what information is "'important' . . . in the field where the agency decision was made." *New York*, 351 F. Supp. 3d at 634.  But, in the same way that a court evaluating whether an agency "considered all of the relevant factors," *Safe Haven Home Care*, 130 F.4th at 324 (quoting *Kempthorne*, 530 F.3d at 1002), may only consider extra-record evidence identifying factors that "do more than raise nuanced points about a particular issue," the Court can only consider extra-record evidence that identifies a sufficiently important problem of "an entirely new general subject matter that the defendant agency failed to consider." *Nat. Res. Def. Council, Inc.*, 598 F. Supp. 3d at 111 (citation omitted).  If the rule were otherwise, the exception would swallow the general rule that limits the Court's review to

the administrative record.  *Cf. Hoffman*, 132 F.3d at 15 ("Courts may conduct plenary review,

and consider additional information obtained from the parties through affidavits or testimony,

only when the administrative record is so inadequate as to prevent the reviewing court from

effectively determining whether the agency considered all environmental consequences of its

proposed action.").

The administrative record makes clear that Defendants considered both theft and the

security of EBT cards in implementing the challenged actions.  Congress instructed the USDA to

implement regulations regarding the replacement of benefits that were "similar" to those in effect

for the previous paper-based system.  CHEN291.  The 2010 Regulation required State agencies

to replace lost or stolen EBT cards.  CHEN422.  It also required State agencies to place an

immediate hold on accounts as soon as notice regarding the need for card or personal

identification number ("PIN") replacement was received.  CHEN423.  After a household

reported its EBT card stolen, State agencies assumed liability for benefits drawn from the EBT

account and the obligation to replace benefits stolen after the theft was reported.  *Id.*

Section 274.8 — issued concurrently with the 2010 Regulation — required State agencies

to permit households to select PINs for their EBT cards.  CHEN424.  State agencies were also

required to develop systems to verify PINs at issuance terminals or at the POS and to ensure

EBT systems met performance and technical standards for system security.  *Id.*  Section 274.8

outlined detailed measures to protect the transmission of transaction data and issuance

information from POS terminals to data processing centers.  CHEN425.  The USDA considered

the circumstances appropriate for replacement of benefits when an EBT card was stolen,

provided recourse to prevent further theft, required State agencies to replace benefits stolen after

they received notice of the need for a replacement PIN or EBT card, and promulgated detailed

security requirements to protect transaction data, PINs, and issuance information.

Plaintiffs' proffered extra-record evidence points to one permutation of theft arising from

a gap in security and is, therefore, not of an "entirely new general subject matter" from the issues

the agency considered. *Nat. Res. Def. Council, Inc.*, 598 F. Supp. 3d at 111 (citation omitted).

Accordingly, the Court will not consider the extra-record evidence submitted by Plaintiffs

pertaining to the prevalence and incidence of skimming.

### B.  Evidence of Standing and the Adoption of the 2022 Policy

Because Defendants have not challenged Plaintiffs' standing to bring this action and their

standing is adequately alleged in the Complaint, the Court need not consider the extra-record

evidence marshalled in support of standing.  As to the extra-record evidence concerning the

adoption of the 2022 Policy, it is impossible for the Court to assess the parties' arguments

concerning whether the policy constitutes final agency action without reference to evidence

outside the record.  This is so because there is an "absence of formal administrative findings"

regarding the adoption of the 2022 Policy given Defendants' position that there is no such policy

separate from the 2010 Regulation.  *See Safe Haven Home Care*, 130 F.4th at 324 (quoting

*Kempthorne*, 530 F.3d at 1002).  The Court will, therefore, consider extra-record evidence solely

to assess the parties' threshold arguments regarding the 2022 Policy.

### III.    The 2010 Regulation Does Not Violate the APA

Plaintiffs argue, and Defendants deny, that the 2010 Regulation is contrary to law,

arbitrary, and capricious in violation of the APA.  Pl. Mem. at 12–21; Def. Mem. at 17–24.

Whether the 2010 Regulation violates the APA "presents a pure question of law" suitable for

disposition on summary judgment.  *Aleutian Cap. Partners*, 975 F.3d at 229; *see also New York*

*v. U.S. Dep't of Health & Hum. Servs.*, 414 F. Supp. 3d 475, 516 (S.D.N.Y. 2019) (observing

that "the usual Rule 56 summary judgment standard" does not apply where the court resolves the "legal questions" of whether "the agency acted in excess of statutory authorization, not in accordance with law, arbitrarily and capriciously, or in some other way that violates 5 U.S.C. § 706" (citation and internal quotation marks omitted)); *Atl. States Legal Found. v. E.P.A.*, 325 F.3d 281, 284 (D.C. Cir. 2003) ("Claims that an agency's action is arbitrary and capricious or contrary to law present purely legal issues.").

### A. The 2010 Regulation Is Not Contrary to Law

The APA instructs courts to "hold unlawful and set aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A). The APA's stricture applies to "*any* law," including, but "not merely[,] those laws that the agency itself is charged with administering." *New York*, 414 F. Supp. 3d at 535 (quoting *F.C.C. v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003)). A reviewing court thus looks to the law that the agency allegedly contravened to determine whether the challenged action is not in accordance with that law. *See Safe Haven Home Care*, 130 F.4th at 320–23. The Court examines the "plain terms" and "core purposes" of the statute at issue. *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 108 (2d Cir. 2018) (quoting *F.E.R.C. v. Elec. Power Supply Ass'n*, 577 U.S. 260, 277 (2016), *as revised* (Jan. 28, 2016)). In doing so, the Court "decide[s] legal questions by applying [its] own judgment," "applying all relevant interpretive tools." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392, 400 (2024).

Congress required that any regulation issued by Defendants "regarding the replacement of benefits and liability for replacement of benefits under" the EBT system "be similar to the regulations in effect for a paper-based supplemental nutrition assistance issuance system." 7 U.S.C. § 2016(h)(7). It is well established that the starting point in interpreting a statute is "the words of the statute." *Solomon v. Flipps Media, Inc.*, 136 F.4th 41, 51 (2d Cir. 2025) (citation

omitted).  If clear, the Court construes the statute according to the "plain meaning" of the text; if unclear, the Court "may consider legislative history and the tools of statutory construction."  *Id.* Plain meaning is assessed "by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."  *Id.* (citation omitted).

By imposing a similarity requirement, Congress indicated that it intended the USDA's regulations governing the EBT system to be "alike in substance or essentials" to the prior regime governing the coupon system, sharing enough "characteristics in common" to be "very much alike," but not necessarily "identical."  *Similar*, MERRIAM-WEBSTER'S UNABRIDGED DICTIONARY, https://unabridged.merriam-webster.com/unabridged/similar (last accessed Aug. 27, 2025); *Similar*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003); *United States v. Washington*, 103 F.4th 917, 921 (2d Cir. 2024) (collecting dictionary definitions of "similar" as "[h]aving a significant or notable resemblance or likeness, in appearance, form, character, quantity, etc., to something stated or implied (though generally without being identical)," "resembling without being identical," and "having characteristics in common . . . alike in substance or essentials" (citations omitted)).  The Court must therefore determine whether the 2010 Regulation shares sufficient characteristics in common with the coupon replacement rules such that the regulations have a significant resemblance to one another.

The predecessor to the 2010 Regulation required State agencies to replace coupons that "were not received in the mail, were stolen from the mail, were destroyed in a household misfortune, or were improperly manufactured or mutilated," but not coupons "lost, stolen or misplaced after receipt."  7 C.F.R. §§ 274.6(a)(1)(ii), (a)(2) (1999).  In its earliest consideration of the rule, the agency distinguished between replacing coupons stolen before and after receipt on the basis of "greater control" exercised "by the household" after receipt, reasoning that it

needed to "protect against households inaccurately reporting that their coupons [had] been stolen" and deter "abuse" by "strik[ing] an equitable balance between attempting to discourage households from making frequent, unwarranted" replacement requests and "the need to serve households experiencing actual losses." CHEN38–39. The USDA recognized that its policy prohibiting replacement of coupons stolen after receipt would "cause a hardship for those participants whose coupons really are stolen," but found "that a recipient should be responsible for coupons once the recipient has the coupons" in order "to better control program accountability." CHEN44. The essential characteristics of the coupon-based replacement regime thus reflected the goal of permitting replacement of stolen coupons within limits to deter fraud and to encourage "program accountability." *Id.*

The Court concludes that the 2010 Regulation shares those characteristics. Much like the USDA permitted replacement of coupons lost or stolen before receipt, the 2010 Regulation allows replacement of EBT cards that are "lost or stolen." CHEN422. In at least one way, the 2010 Regulation implemented a more permissive replacement regime: it does not distinguish between EBT cards stolen before and after receipt like the predecessor regulation. *Compare* 7 C.F.R. §§ 274.6(a)(1)(ii), (a)(2) (1999) *with* CHEN422. To the extent that the 2010 Regulation does not permit replacement of stolen benefits, but does permit replacement of the physical card necessary to obtain those benefits, there is precedent for the agency's action; the USDA referenced approvingly another benefits program that permitted replacement of stolen checks but not cash stolen from recipients after they had cashed the checks. CHEN44.

The Court recognizes that this is not the same scenario. Under the paper-based regime, the coupons that households received served as the "currency" that households exchanged for food, whereas under the EBT system, the EBT card transfers the "currency" to the vendor at the

POS.  A theft of a household's benefits, then, at the POS does not implicate quite the same "accountability" concerns as theft of those same benefits when the household controlled the paper coupons.  But, the agency previously contemplated and accepted that the replacement rules for coupons would impose "a hardship" on those from whom coupons were stolen.  CHEN44.  Whatever the wisdom (or lack thereof) of striking that balance between preventing fraud and feeding impoverished people, the Court has to presume that Congress was familiar with the agency's prior position when it directed the agency to implement regulations for the EBT system that were similar to those that applied to the paper-based system.  *See Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, 863 F.3d 96, 114 (2d Cir. 2017) (presuming Congress "legislate[s] with familiarity of the legal backdrop for its legislation"); *Forest Grove School District v. T.A.*, 557 U.S. 230, 239–40 (2009) (noting Congress is presumptively aware of administrative interpretations of a statute and adopts interpretation by re-enacting the statute).  In all events, Congress instructed the USDA to implement regulations that were similar, not identical, to those governing coupons.  *Washington*, 103 F.4th at 921.  The provision allowing replacement of lost or stolen EBT cards is at least similar to the provision allowing replacement of lost or stolen coupons, regardless of the dissimilarities that exist between theft in a paper-based system and theft by skimming in an electronic system.

### B.  The 2010 Regulation Is Not Arbitrary or Capricious

Plaintiffs argue that the 2010 Regulation is arbitrary and capricious because Defendants failed to consider the pervasive problem of skimming.  Pl. Mem. at 18–19.[7]

---

[7]       Plaintiffs also argue that Defendants failed to consider whether the 2010 Regulation was similar to the regulations governing the paper coupons, Pl. Mem. at 17–18, and that the 2010 Regulation is illogical for ignoring the group of people that SNAP was established to protect, *id.* at 19–21.  The former argument is unavailing because the Court has determined that the 2010 Regulation is similar to the replacement rules for coupons.  As to the latter argument, the Court recognizes that the purpose of SNAP is to "permit low-income households to obtain a more nutritious diet through normal channels of trade by increasing food purchasing power."  CHEN237.  As discussed above, however, in light of Congress's instruction to implement a similar regulation to the coupon regime, the 2010

An agency's action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem." *Safe Haven Home Care*, 130 F.4th at 323 (citation omitted). A reviewing court should not "lightly" reach the conclusion that the agency "overlooked something important." *State of New York v. Dep't of Just.*, 951 F.3d 84, 122 (2d Cir. 2020) (citations omitted). Perhaps in part due to the paucity of comments received in the rulemaking process, the record is sparse as to the USDA's rationale for adopting the 2010 Regulation, beyond Congress's instruction to implement rules "similar" to those governing coupons. *See* CHEN291. Nevertheless, the Court cannot conclude that the agency failed to consider an important aspect of the problem when it ignored skimming.

The Court rejects Defendants' argument that an issue must be presented before, and subsequently ignored by, an agency in order to qualify as an important aspect of the problem that the agency failed to consider. *See* Def. Mem. at 22–23. That view would preclude a court from redressing "the most egregious APA violations: those in which the administrative record is carefully cultivated to exclude contrary evidence." *New York*, 351 F. Supp. 3d at 634. Nevertheless, the Court disagrees with Plaintiffs that the agency failed to consider an important issue by failing to address the problem of skimming. As discussed *supra* at Section II.A, when adopting the 2010 Regulation, the USDA focused on the theft of EBT cards and the security of the EBT system. CHEN422–25. Where, as here, the agency implemented detailed regulations on the general subject matter at issue — namely, measures to replace stolen EBT cards and to address data security, *see Nat. Res. Def. Council, Inc.*, 598 F. Supp. 3d at 111 — it is improvident to take the agency to task for a problem never "raised before it," *Nat. Res. Def.*

---

Regulation is not "illogical on its own terms," *Evergreen Shipping Agency (Am.) Corp. v. Fed. Mar. Comm'n*, 106 F.4th 1113, 1118 (D.C. Cir. 2024) (citation omitted), for accommodating some degree of "hardship," just as its predecessor regulation contemplated, CHEN44.

*Council v. U.S. Dep't of Energy*, 362 F. Supp. 3d 126, 148 (S.D.N.Y. 2019) ("It most emphatically remains the duty of [federal courts] to ensure that an agency engage the arguments raised before it -- that it conduct a process of *reasoned* decision making." (quoting *K N Energy, Inc. v. F.E.R.C.*, 968 F.2d 1295, 1303 (D.C. Cir. 1992)).[8]

In short, Defendants are entitled to summary judgment that the 2010 Regulation does not violate the APA.

## IV.    The 2022 Policy Is Not Subject to Plaintiffs' APA Claim

Defendants argue that Plaintiffs failed to plead their claim regarding the 2022 Policy, and, even if timely pled, the 2022 Policy is not a final agency action subject to APA review. Def. Mem. at 12–17.  Plaintiffs struggle to define clearly what agency actions they contend constitute the 2022 Policy.  Their brief defines it as "Defendants' policy prohibiting replacement of skimmed SNAP benefits with federal funds."  Pl. Mem. at vi.  Plaintiffs propose an amalgamation of State and federal agency documents that they claim evince the existence of the 2022 Policy: an October 2022 policy memorandum issued by FNS that does not mention replacement of skimmed benefits, *see* Ex. R; an October 2022 message from New York's Office

---

[8]    Even if the Court were to consider Plaintiffs' extra-record evidence, it would not carry the day.  At best, the articles and DOJ press release that Plaintiffs collected indicate that, at the time the 2010 Regulation was adopted, there had been a few reported incidents of skimming, not that skimming was a pervasive problem that the USDA should have considered. *See* Exs. I–M, V, Z.  For instance, an April 2009 article noted that skimming of ATMs was a "supposedly rare kind of crime," although some experts believed that ATMs were "increasingly vulnerable."  Ex. K at 3.  A 2014 article tracing the origins of skimming observed that "it was years before [its] existence was confirmed," but noted that there were "traces and whispers of skimmers" between 2002 and 2007.  Ex. M at 2–3.

The evidence post-dating the 2010 Regulation, however, tells a different story.  In 2011, an FBI official testified before the House of Representatives that skimming is "a prevalent global cyber crime."  Ex. T at 4.  A 2016 report issued by the Congressional Research Service found that between 2004 and 2010, fraud committed on U.S.-issued bank credit cards increased 70%, driven in large part by POS intrusions taking advantage of magnetic stripe cards carrying unencrypted data.  Ex. CC at 4, 6, 6 n.25.  Although the Court cannot fault the USDA for failing to recognize the threat of skimming in 2010, it is surprising that the agency has not revisited its replacement policy (beyond the express directive by Congress in the 2023 Appropriations Act) or elected to replace magnetic strip cards with the more secure type of card that contains a chip in light of the evidence known to the agency today about this problem.  *See* Exs. H and CC.

of Temporary and Disability Assistance ("OTDA") explaining that Defendants "prohibit[]
replacing stolen SNAP benefits using federal funds," Ex. E at 3; a December 2022 policy
bulletin from New York City's Human Resources Administration ("HRA") providing the same
explanation, *see* Ex. O at 1; and a January 2023 policy memorandum issued by Defendants
directing States to submit plans to process claims for stolen benefits to the extent allowed by
Congress in the 2023 Appropriations Act, *see* Ex. P at 1–2.

### A. The Allegations Regarding the 2022 Policy Were Not Timely Pled

Plaintiffs did not timely plead their allegations regarding the 2022 Policy. It is well-
established that "[o]rdinarily, parties may not amend the pleadings through motion papers,"
*Soules v. Connecticut, Dep't of Emergency Servs. & Pub. Prot.*, 882 F.3d 52, 56 (2d Cir. 2018),
which includes filings in connection with a motion for summary judgment, *see Protective
Specialty Ins. Co. v. Castle Title Ins. Agency, Inc.*, 437 F. Supp. 3d 316, 328 n. 17 (S.D.N.Y.
2020); *Chairnoff v. Nat'l Westminster Bank, N.A.*, 309 F. Supp. 2d 581, 586 (S.D.N.Y. 2004);
*Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch Co.*, 292 F. Supp. 2d 535, 544
(S.D.N.Y. 2003). The Complaint references the October 2022 FNS policy memorandum for the
proposition that Defendants "acknowledge the harm that skimming has been causing SNAP
participants and list steps that they can take to try to prevent skimming" but admits that it does
not mention replacement of benefits. Compl. ¶ 63. The October 2022 OTDA message is cited
frequently to describe skimming, the increased incidence of skimming, and the above-referenced
explanation that federal funds cannot be used to replace skimmed benefits. *Id.* ¶¶ 59, 63, 68.
The Complaint cites the January 2023 policy memorandum to demonstrate the guidance does not
apply to Plaintiffs, whose benefits were stolen prior to October 2022. Compl. ¶ 64. The
Complaint also alleges that the January 2023 memorandum is consistent with the 2010

Regulation, which Plaintiffs claim is "unlawful" because it "does not authorize States to replace SNAP benefits stolen by skimming or accept liability for replacing benefits." *Id.* ¶ 65.

Nothing in the Complaint, however, asserts the existence of a 2022 Policy or even implies that the cited 2022 and 2023 agency documents constitute a cohesive policy. At most, the Complaint cites those documents for background information on skimming and to reinforce the alleged unlawfulness of the 2010 Regulation. *See id.* ¶ 59 (describing the practice of skimming), ¶ 63 ("there has been an increased incidence of skimming of EBT benefits"), ¶¶ 48, 64–65 (noting that, at Congress's direction in the 2023 Appropriations Act, the January 2023 memorandum prohibits replacement of stolen EBT benefits that pre-date October 1, 2022, consistent with the 2010 Regulation).[9]  A complaint requires only a "short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), embodying "a policy of 'notice pleading' that eschews the need to plead specific types of documentary evidence to establish a plausible claim," *Corley v. United States*, 11 F.4th 79, 89 (2d Cir. 2021). Rather, a complaint need only "put[] the defendant on notice of the claims against it." *Phillips v. Girdich*, 408 F.3d 124, 127 (2d Cir. 2005). The Complaint plainly does not put Defendants on notice that Plaintiffs are challenging the 2022 Policy. It neither alleges that a policy exists separate from the 2010 Regulation nor describes the basic contours of that policy sufficient to put Defendants on notice of Plaintiffs' claim that the policy is unlawful.[10]

_____

[9]    The Complaint also refers to "policies and regulations," rather than a single policy or regulation, in stating the cause of action. Compl. ¶¶ 114, 116. But general allegations of "policies" cannot replace pleading the existence of the specific 2022 Policy that Plaintiffs now raise.

[10]    Plaintiffs mischaracterize the portion of Defendants' motion to dismiss that summarizes the allegations in the Complaint. *See* Pl. Reply Mem., Dkt. 91, at 23–24. Defendants stated that "Plaintiffs . . . further assert that USDA's policy concerning the replacement of skimmed funds 'is consistent with its unlawful regulation,'" Def. Mot. to Dismiss, Dkt. 31, at 5 (quoting Compl. ¶ 65), and further observed that "plaintiffs assert that the policy guidance USDA issued in January 2023 concerning the Appropriations Act does not 'change the regulation 7 C.F.R. § 274.6, which limits States' ability to replace benefits' skimmed prior to October 2022 'using federal funds,'" *id.* (quoting Compl. ¶ 64). Defendants closed that paragraph by stating, "Consequently, '[t]he limitations that

### B.  The 2022 Policy Is Not a Final Agency Action

Even if the Court were to conclude that the 2022 Policy was timely pled, it would not be subject to challenge under the APA because it does not constitute final agency action.  For an agency action to be final and thus subject to challenge under the APA, the action: (1) "must mark the 'consummation' of the agency's decisionmaking process;" and (2) "must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted).  The action "must not be of a merely tentative or interlocutory nature."  *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016).  An agency action is final if the agency "has issued a 'definitive statement of its position, determining the rights and obligations of the parties.'"  *Sharkey v. Quarantillo*, 541 F.3d 75, 89 (2d Cir. 2008) (quoting *Bell v. New Jersey*, 461 U.S. 773, 780 (1983)).

As constructed by Plaintiffs, the 2022 Policy does not reflect the "consummation" of any decisionmaking by Defendants.  *Bennett*, 520 U.S. at 178 (citation omitted).  As discussed above, the 2022 Policy consists of several messages from New York agencies regarding the prohibition on reimbursement of benefits lost to skimming, an FNS memorandum wholly unconcerned with replacing stolen benefits, and a January 2023 memorandum implementing the 2023 Appropriations Act's reimbursement regime.  Plaintiffs offer no support for their position — nor can the Court locate any authority suggesting — that, because State agencies are obligated to comply with Defendants' actions, 7 C.F.R. §§ 272.2(a)(2), (b), or because OTDA "is the agent of

---

Defendants impose on replacement of [the] full value of stolen EBT benefits remain in force."  *Id.* (quoting Compl. ¶ 64).  Read in context, Defendants' assertions suggest they understood Plaintiffs to allege that the 2010 Regulation remains in force, not that Defendants had notice of the alleged 2022 Policy.  Furthermore, Plaintiffs raised the existence of a final agency action that occurred in 2022 in their opposition to Defendants' motion to dismiss.  Pl. Opp., Dkt. 38, at 17–19.  In reply, Defendants argued, as they now do on summary judgment, that the Complaint failed to allege the existence of a 2022 policy.  Def. Reply, Dkt. 40, at 2–4.  Finally, even if the Court interpreted Defendants' earlier statements as recognition that Plaintiffs assert some claim in connection with the January 2023 memorandum, Plaintiffs do not argue that the memorandum's prohibition on reimbursement is, in and of itself, unlawful agency action (nor could they, inasmuch as that restriction was expressly required by Congress).

the [USDA] for the purposes of participation in" SNAP, N.Y. COMP. CODES R. & REGS. tit. 18, §

387.0(a), the actions taken by State agencies can be attributed to Defendants for the purposes of

APA review.  Such an interpretation would make little sense; the APA's requirement of a "final

agency action" necessarily presumes that the agency itself, and not some other agency, took the

challenged action.  5 U.S.C. § 704.[11]

The other component actions supporting the existence of the 2022 Policy — the October

2022 and January 2023 memoranda — do not provide a "definitive statement of" Defendants'

position on reimbursements for benefits lost to skimming.  *Sharkey*, 541 F.3d at 89 (quoting *Bell*,

461 U.S. at 780).  The October 2022 memorandum does not address reimbursements at all.  *See*

Ex. R.  Defendants issued the January 2023 memorandum while they "work[ed] to implement an

interim final rule" required by Congress that would allow States to use federal funds to replace

benefits stolen through skimming during the period from October 1, 2022, through September

30, 2024.  Ex. P at 1.  To the extent that the memorandum is, in and of itself, "final agency

action" subject to APA review, the reimbursement policy it articulates directly accords with

Congress's instructions in the 2023 Appropriations Act.  *See* 2023 Appropriations Act, H.R.

2617, 117th Cong. § 501(b) (2022); CHEN433–34.

The Court understands Plaintiffs' argument to be that the 2023 memorandum evinces a

more general policy prohibiting replacing benefits stolen through skimming with federal funds

that predates October 2022, when Plaintiffs' injuries occurred.  *See* Pl. Mem. at 10–11, 21–23.

Plaintiffs point to no "single step or measure" taken by Defendants and instead couch their

argument by reference to "an on-going program" of prohibiting reimbursements.  *Cobell v.*

*Norton*, 240 F.3d 1081, 1095 (D.C. Cir. 2001) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S.

---

[11]    Discovery may have revealed some level of coordination between the State and federal agencies from which the Court could have inferred direction by Defendants, but Plaintiffs did not seek discovery in this action.

871, 890 (1990)).  Such a program is not subject to review because the APA "does not extend to reviewing generalized complaints about agency behavior."  *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) (citing *Cobell,* 240 F.3d at 1095).

In short, the only actionable measure regarding "Defendants' policy prohibiting replacement of skimmed SNAP benefits with federal funds" is the 2010 Regulation, which does not violate the APA.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment is DENIED, and Defendants' motion for summary judgment is GRANTED.  In the Court's view, it is unfortunate that victims of a sophisticated theft of federally-provided benefits — benefits necessary to put food on their tables through a program long established by Congress — cannot be reimbursed for that theft with federal funds even when the skimming has been verified.  Each Plaintiff in this lawsuit lost between a few hundred and a few thousand dollars to skimming.  Pl. Mem. at 10–11.  While not a king's ransom to many New Yorkers, the Court does not question that the loss was significant to them and that similar, significant losses have been sustained by other similarly situated SNAP benefits recipients.  Despite the Court's conclusion that Defendants' policy does not violate the APA, it is the Court's sincere hope that Congress or the USDA will devise a better solution to the skimming problem.

The Clerk of Court is respectfully directed to terminate the open motions at Dkts. 64 and 84, enter judgment for Defendants, and close this case.

**SO ORDERED.**

**Date:  August 28, 2025
        New York, New York**

**VALERIE CAPRONI
United States District Judge**